Arguing all the Ethics of Independent Defendant. Mr. Richard J. Dvorak are arguing on behalf of the Court of Appeal, Mr. Damon A. Grohbolte right Mr. Dvorak Your Honors, I first want to start off by saying what this case is about or not about because the state in their brief, and I quote, it said, it's disingenuous for the defendant to claim that he believed the very joy to be legal. But that's not our argument. Our argument is that the undisputed evidence shows that the defendant knew it was legal. Our argument is that the undisputed evidence shows that the state did not prove he knew it was illegal. And I think that's a critical difference here because I think when you look at this evidence, especially regarding the statements by Mr. Monteleone, is that they're he had suspicions of the legality of the product, but there was absolutely no evidence that would rise to the level of reasonable doubt. Was there evidence that your client knew it was illegal federally? Yes. Well, whether one knows it's illegal or illegal federally is a little hard to understand, but there was certainly a statement that he believed it to be illegal federally. And the trial court could rely on that statement, could it not? Sure. They absolutely could rely on that statement. But a couple of things. First of all, I don't think you would necessarily cherry pick one statement in a conversation because there was numerous other statements that in detail about how he thought at one time they were illegal and then he thought it was legal. He thought it may be illegal federally, but not state. But the very end of the conversation ends by saying a simple question. Did you believe Mary Joy and Dead and Buried were illegal? And he said no unambiguously. So and obviously we're not in federal court as well, which would be my second point. So if we're talking about knowledge that you're doing something illegal, if you know it's illegal, I checked, Illinois is under federal law as well as state law, correct? Yes, your honor. I guess my rebuttal to that would be with regular cannabis, there's lots of state laws that allow you to possess cannabis, sometimes for recreational use, period. That's absolutely against federal law. But it doesn't mean you could prosecute that person if Illinois made it legal in state court. Now if he was in federal court, that might be another matter. But just like with the cannabis cases for recreational use in several states, Colorado, et cetera, a statement that I knew cannabis was illegal federally would not be admission of guilt in Colorado or Oregon based on a state law prosecution. But you don't have to go into the back room in Colorado or Oregon to the best of my knowledge. It's advertised rather openly and notoriously, and people go there for that very reason. It's not so in this particular case, is it? It is not, your honor. And well, first of all, Mr. Montgomery did offer an explanation for that, and there was proof that he'd been burglarized before that. He had a lot of things in his store that he could be burglarized for. Did he have them all hidden away in a safe? Well, it appeared that people were specifically targeting these products, and I think that's why they were put away in a safe. But also, I think for that to be true, that well, that's going to be a significant factor, and that's going to be the deciding factor in this case, we would essentially have to say that we're not going to follow Trapa and Patel, which this court is free to do. I'm just saying I think we'd have to acknowledge that fact. Because in Trapa, that's exactly what happened in Trapa as well. All of the areas, and the state went through in their brief of where the products were hidden. One, under a cash register counter. Two, an open box underneath the counter. Three, an open box under the counter. I think I missed one, but they're all concealed as well. So I think we'd have to basically acknowledge that we're not going to follow Trapa, we're not going to follow Patel. But the sale in Trapa wasn't concealed. The sale took place in the store. Yes. And it was scanned into a scanner by the clerk, correct? Correct. But these also occurred in his store. This wasn't, you know. Well, they took place in the back room, that he was called back, or the agent was called back into the back room to conduct the transaction. Correct. And I also think that we have to remember that Mr. Montrillon purposely set up a video camera at his store to record all of this. If he truly believed he was doing something illegal, he wouldn't videotape himself. How did he miss the police officer three times on his video? I'm sorry? How did he miss the police officer three times on his video of all these transactions? How did he miss the officer? Yeah, how did that, how did the officer not appear on the video at the cash register? Well, because I think there's a factual dispute about whether or not he actually was where he says he was. But I don't think it's disputed that the area was, in fact, videotaped. No, the question is, how is it that the police officer does not appear on the video? I mean, I guess I'm standing on a question, but I think... You're saying that these transactions also place on his videotape that he set up to capture these transactions. My question is, why is the police officer, in his three occasions, not on the tape? And that's exactly correct, because Mr. Montrillon said he was not back there. That's the factual dispute that's actually favorable to the defense, because it actually contradicts the officer's not telling the truth, because if he was, he would be on that video. So I think that's the situation there. Not that it proves that this was an un-videotaped area. It's undisputed that this was a videotaped area. The back room was, or the front? The, well, the front was the main area, but it included the back area where these sales supposedly occurred. So the police officer was never even in the store? No, they were in the store. But the transaction concerning these products... Correct. ...is not captured anywhere? Well, the, the, exactly, because the officer wasn't where he, the officer wasn't actually where he claimed he was. But if we looked at that videotape again, we would find him in the front of the store? I don't think you would find him where he says he was in the back of the store. So, no, I don't think you would find him there. All right, but he had to walk through the front door? Yes. So we would find him walking through the front door at about the time of these sales? Um, no, because I don't think that that's on videotape. Correct. Well, you just said the whole store was videotaped. It is, but the front area is on videotape, okay? It includes the back area. Um, but what I'm saying is I don't think there was any evidence produced, um, that would show the, with the actual transaction occurring in the back area. So it would include, it would include the officer being in that front area, yes, if that's the question. But not, not the transaction going down, because they said it occurred in the back when it didn't. I'm not sure if I'm making sense. There were videos presented at the trial that showed the credit card transactions, correct? Yes. Was there a video presented at the trial that showed these transactions? Um, not in the manner in which the officer said there was, but there was, it was captured on video, correct. I know. What was, what was shown at trial? What was, what did the trial judge see? He saw a videotape of an interaction between Mr. Monteleone and the officers, which included Mr. Monteleone going in the back, but not the officer going in the back with him. That's my understanding of it. I have not reviewed this in several months, but that's my understanding of it. I did not view that yesterday or today in preparation. But that was my memory of it, if I'm not mistaken. Um, with that I can reserve my time, unless your honors have further questions. I did have a question. I noticed that following either the first or the second burglary, your client made an insurance claim? Correct. What happened with that? I don't know if that's in the record. I can't answer for you. It's in your brief. I'm sorry. It's in your brief that the claim was made. Yes, I remember reading that, but I don't remember ever seeing anything about what happened. That's my question to you. I don't think that's in the record. Interesting. Okay. Thank you, sir.  Um, good morning, your honors. Um, I think the record, if you look at the totality of circumstances, it shows that the defendant clearly was aware that this product was illegal. Um, the fact that he took the person, the first time the undercover agent went in, he took another customer to the back room to buy this product. When that customer left, he took that undercover agent to the back room. There's a reason he wants to do that because he knows it's illegal. He doesn't want it on his videotape. Um, he never rang up the transactions. He always put the cash, and I think he said in his left pocket or his right pocket, and then his other pocket had, you know, for his suppliers. Um, he kept it in a safe. There was no receipts given. Um, there was a number of times, you know, when they bought it, and he was in the back, back room. Um, he told the agents, you know, he, or the police, that he knew that young people rolled this material into blunts and smoked it, that he had used it, he had gotten a head rush, but, um, he didn't get high. Um, he said he kept it in the back room because he believed it to be illegal federally. He wasn't sure about Illinois. Um, when he was selling to the undercover officer at the Denberry, he told them, watch it, it'll not be on your ass. Obviously, he knew something that was in this product that was illegal. Well, you're not going to buy these products unless you're going to get some effect from them. Maybe not necessarily what he observed or what he said might happen, but what's the point of buying these products if you're not going to get some physical reaction from them? Well, some would say just to, for potpourri, but definitely it's to get a high. It's spice, it's synthetic cannabis. Okay, but does a high necessarily mean it's illegal? Because a lot of people get high on alcohol, and that's not necessarily illegal. Well, no, the fact that he knows it when young people come in to buy this product, he's aware, he has to be aware. He admitted that he was... He has to be aware is not necessarily proof beyond a reasonable doubt. It is, we are saying, or I think you're saying, everything he knows about this, he just, it's, he has to know there's a problem with it. Why is that when you look at the other two cases in particular that are cited by counsel? Well, because Chatha, you could see in Chatha, the owner of these gas stations, he did everything he did because he wanted to make sure it was legal. He made no attempt to secrete the packages. Now, I set out in the brief that this product was under the counter open, but also there was six jars on a counter, on top of a counter near the register, openly displayed. There were five jars on top of a store safe, and the unopened stuff was underneath the counter. It wasn't in the bathroom. It wasn't in a safe. That's certainly different. And then there's this barcode right next to the register that they used to sell the product You know, there was uncontroverted evidence that he was trying to comply with the laws. In November of 2011, there was a Mars City ordinance where his other gas station owner says, no more, we can't sell, you can't sell this product. He immediately pulled the product. In December of 2011, when the legislature passed a law making this illegal, he pulled the product from a store. Then in January, a supplier came in and said, oh, you know, here's the lab report. Look, it's not illegal. There's no illegal substances. He heard from customers saying, why do we have to go to Bloomington to buy this stuff? The smoke shop is selling it. He called the smoke shop, said, okay, that's true. So he did his due diligence. He really tried to see whether this product was illegal or not. We don't see these types of behaviors in the defendant. And I think that really makes a difference. The defendant had much more knowledge about it. He had smoked it. He had sold it. He was familiar with drug products. He admitted he had a quarter pound of marijuana in his home. He had some in his pocket. So he was kind of, he was very knowledgeable of this product. Did he offer to sell some of the marijuana during any of these transactions? No, there's nothing on the record. But how do we know he had it just because of the searches? I think they did a search on him, and then he admitted that, well, there was two tubs of the spice in his wife's car, and he had a quarter pound of marijuana in his house, and he said, those are mine, not my wife's. So he did it. He never tried to sell that, though. It's clear that this is just a synthetic category. And then he did it, admitted in his written statement that he sold Mary Joy and then buried illegally in his store. So we do have that admission. Well, the argument is that he was told that that stuff was illegal by the police, and then he wrote that in his statement. Well, if he believed it wasn't, why would he listen to the police? I mean, the fact is, is I think he had this knowledge certainly way long before the police told him that. And I think, you know, he would not write that in a written statement unless he believed it. He believed it was illegal federally, so it does follow. The trial court relied on McFadden for guidance as to how the state may prove knowledge. You don't cite that in your brief at all. Do you think that that's not applicable? Well, to tell you the truth, I don't remember now, Your Honor, because it's been so long since I prepared this case. But, again, you do have to look to the totality of circumstances and the fact that, on this level, we have to look at the case in the light most favorable to the prosecution. I don't think any rational trier of fact would not believe that he had knowledge, and especially when you look at also all reasonable inferences, have to, I'm trying to think of the word, favor the state. And you argue the facts. I understand that, but, I mean, there's no law in here as far as how we should really look at the facts when it comes to the issue of knowledge. I mean, you certainly argue that we're supposed to take the facts in the light most favorable to the state. You go through the facts thoroughly, but there's nothing in here to tell us how we should look at it through the legal lens. I guess I thought the factual statements were so strong, you know, I maybe did not include, I don't know what my thinking was at that time, Your Honor. And then finally, the defendant had also admitted that he had smoked or consumed this stuff five times. He sold 20 to 60 packets a day. He said the young people would come in for it more because the high wasn't very long. They couldn't get addicted to it because it would last for a very short period of time. So he was making money knowing that this product was being used illegally. I mean, this isn't legal. This is not a legal argument that just Burke is looking for, but there is that saying, if it walks like a duck, it talks like a duck. He knows a lot of things about this, and he knows that everything he knows, with the exception of that Internet search, personally tells him that he gets a head rush, everybody likes it, kids do this with it, and it's illegal other places. I mean, what more is required by the statute? I don't know, Your Honor. I think that's plenty. I think especially when looking into the light most favorable to the prosecution and all the reasonable inferences favoring the state in this case. But McFadden talks about a specific issue of knowledge that it is on, the substance contains a Schedule I or Schedule II drug. We don't have quite that issue here. It would be knowledge that it contains this synthetic cannabinoid. Well, I think everyone in the general public knows that this spice or potpourri contains that. I mean, the general public knows that. Well, I thought I was the general public. Apparently I'm too old. But, I mean, if that's what you're relying on, if that's what the state's relying on, general public knowledge. Well, I think it's not just that there's a general public knowledge, but also we have, like you said, walks like a duck and talks like a duck. It's a duck, and that's what we have here. I think this is just an extraordinarily good case when you're given the totality of circumstances that he had knowledge of what this product was. This is a person that had dealt with other illegal substances and consumed this product. I don't know, you know, it's certainly different than the Chaffin case. In Chaffin, we have a lot, as you've gone through, we have a lot of evidence that the store owner did his due diligence to try and figure out whether this stuff was illegal. Correct. Now, Patel is the clerk in that same case.  We don't have that same evidence with Patel. With Patel, we have a clerk who knows that it's called spice, who knows that people smoke it. At least in that case, it was not on display. Was Patel wrong in his assignment? I would say, I would hate to make that determination. We won't tell the Fourth District. Okay. I would say yes, because it doesn't show his due diligence, but he can rely on his manager saying, I really checked this out. I don't know if that was particularly in that case anymore. My manager told me, I checked this all out. He says it's okay to sell. He relies on that. It's his manager. That's the only difference I can see in that case from Chaffin. And, you know, I just feel that both of those cases are far different than this case. I think the evidence here is just far stronger. If you understand. Thank you. Mr. Doar. Thank you. Counsel, is the evidence here stronger on behalf of the state than in Chaffin and or Patel? I don't think so. I would put it on equal footing. I think the only difference possibly would be the statements in this case. If you just take out the one statement of, I knew it was illegal federally. Okay. It is a distinguishing difference. However, the problem with that is what I've already discussed, you know, that that's not a mission, that it was illegal statewide. And also, too, you've got to put into context all the other statements where clearly he was saying he did not know it was illegal. In Chaffin, the store owner really did a great deal to find out whether the stuff was legal or not. And the appellate court seemed to really rely on the fact that the store owner pulled the stuff from the Morris store, didn't sell it in Morris because that would be in violation of the law, to show that he was trying to comply with the law. And we don't have that in this case, correct? Correct. But juxtaposed to that, in this case, we have your client agreeing, at least in the future, to sell cannabis to the undercover officer. That's a mindset. On the one hand, someone who's going out of their way to follow the law, and on the other hand, someone who is at least making a statement to the officer that I will sell you cannabis illegally in the future. Well, I'm not sure if that really is relevant to the issue of the product. The knowledge of legality of this product? Of this particular product? Yeah, I would not say that that supposed admission to some other crime's evidence, essentially what it would be, would be relevant to the issue of whether he thought that this particular product was legal or illegal. So when you argued earlier in your first argument that we're supposed to look at the totality of the circumstances, that is not one of the circumstances we're supposed to look at? Well, I think obviously you're free to look at that circumstance. I just don't think it's a relevant circumstance, or certainly not a circumstance that would get over the State's burden. And I think in that regard, too, I think Patel doesn't have those circumstances we're talking about, about this sort of going out of the way to get the letter, et cetera. And I think this Court would have to essentially say they disagree with Patel in order to come to that conclusion. So the problem, though, with sort of distinguishing CHAFA versus this case based on, well, did you get a letter, or did you do this, this, and that? The problem more holistically is it really puts the burden on the defendant to prove lack of knowledge versus the State's burden to prove knowledge, which is where I started this whole argument to begin. Sure, did CHAFA take a pretty substantial step to try to determine whether this was legal or illegal in that letter? Sure. But you also have to remember, in this case, Mr. Marantino did actually look up this evidence and find out that, at least what he found, it was legal. Now, again, the State can't rebut that, just like the State can't rebut CHAFA. There's no evidence to say he didn't do that. So I think you can't just ignore the evidence just because it came out of the defendant's mouth. It's not contradicted. It's not disputed. It's just a fact out there that can also be considered with the totality of the circumstances. But the trial court doesn't have to believe the defendant. I mean, the defendant could say he did all kinds of things, and the trial court didn't. That's not a fact. That's just something that's a piece of evidence that the trial court can either believe or not believe, correct? Well, I think that's what the State argued in CHAFA, too. We don't have to believe that he went through all these measures that he did. There wasn't unrefuted evidence that he did that. The police couldn't verify what Mr. CHAFA was saying. That was just his testimony that was not rebutted. And I think that's the same circumstance as here. Before I run out of time, I would like to talk about the McFadden issue because the State did not bring up McFadden. Either the trial court did or Ramos. A few federal cases on that. And I think that was probably intentionally because I do believe that that case law, which essentially would be federal common law, which is not binding on this Court, it's not constitutional law, relies, the way I read it at least, it's the similarity and the effect. That's sort of the way they look at it. Is it similar and does it have an effect? And the problem with that is then we'd have to overrule CHAFA and Patel because that's essentially what CHAFA and Patel are, is similarity and effect, and yet they were found not guilty. Well, in the footnote of McFadden, the Court talked about examples of circumstantial evidence that would prove the mental state of knowledge. Not just the effect, the knowledge of the effect or knowledge of the product. It's concealment of activities, evasive behavior with respect to law enforcement, and knowledge that the substance created a high similar to a controlled substance. So it's not just the knowledge, but it's also the evasive behavior and concealment of activities, which arguably we have in this case. Well, I think you would arguably have those in CHAFA and Patel as well. I don't see any difference there in those cases, and I think the State not asking this Court to adopt that standard, I think we should go under the CHAFA and Patel standard, and I think under the CHAFA and Patel standard, there's no meaningful difference between the facts of this case. One final point if I may, I know that I ran out of time, is I want to address Your Honor's legal argument about walks like a duck, talks like a duck. I said that was a non-legal argument. A non-legal argument. Well, the problem is the State hired two expert witnesses to testify that this was an analog, and therefore, you know, the State had to prove chemically through expert testimony  I don't think it's the common knowledge of everyone else that it's like a duck. It may not be common knowledge, but if your client is to be believed, he went online and did a lot of research. I don't know exactly what he said, but I'm sure some of that research identified these letters that identify the substance. Now, once you do that, how can you come back and say, well, yeah, I did all this research, and I found all these letters, but I didn't really know about the act, and I didn't really then look into that. If his sole purpose was to see if it was legal in the State of Illinois, and he did all of this research, how could he then say, well, I'm going to stop now, I'm not going to check to see what ATX or ATR is, something like that. Because I think then we'd be adopting a negligence or even recklessness standard, that should he have probably stopped selling this knowing there was some ambiguity in the law? Sure. Is that negligence? Is it possibly even recklessness? Possibly. But I guess my point would be, is it knowledge? Or is it an attempt to avoid knowledge? Say I went this far, but I'm not a chemist, I can't go any farther. Well, if the attempt was to avoid knowledge, he wouldn't have done the search in the first place. It wouldn't matter to me. I have a question. Sure. Tell me what is the difference between the transactions in Patel and Chapman versus the transactions in your case? Well, they're both open. You're saying that they're both similar. Well, they're both in a smoke shop. Well, it wasn't a smoke shop at the time. Okay, I'll give you that one. They're inside, they're under a roof, we're not on a street corner. Seems to me that's kind of where the similarities end. I would disagree just because this was not something where you go to aisle 5 and there's advertisements that say, you know, buy your spice here, buy your synthetic cannabis here. This was fairly secreted stuff, and people knew to ask for it. And people were coming into the stores in Chapman Patel and saying, you know, teenagers were coming and saying, yeah, I got that stuff. I mean, very similar to here where, you know, there are certainly red flags. And yet in that case, they said, well, red flags are not proof beyond a reasonable doubt of knowledge. What about lack of the use of a register, no barcodes, no receipt, no tax charge, basically no stream of commerce in your case? And yet there was with Mr. Patel and Mr. Chapman. Well, I don't know what the evidence necessarily says about receipts because all we have is the officer saying he did not see a receipt at the time. We don't have any kind of forensic evidence that indicates whether or not there is receipts found or not found. There was no attempt by the police to make that kind of determination. I think that at best the officer can just say he didn't get receipts, okay? But there's lots of stores out there where you don't get receipts. That doesn't mean that it is illegal. All right. Thank you, counsel, for your argument this morning. We will take the matter under advisement. We will issue a decision in due course.